**IT IS ORDERED as set forth below:**



**Date: March 31, 2022**

*Susan D. Barrett*

Susan D. Barrett
United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Augusta Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 Case |
| | ) | Number <u>18-11661</u> |
| LILO N. BENZICRON, | ) | |
| | ) | |
| Debtor. | ) | |
| ――――――――――――――― | ) | |
| | ) | |
| KIM BAKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding |
| | ) | Number <u>19-01008</u> |
| LILO N. BENZICRON, | ) | |
| | ) | |
| Defendant. | ) | |
| ――――――――――――――― | ) | |

**<u>OPINION AND ORDER</u>**

Kim Baker ("Baker") seeks a determination that the debt

owed to him by Lilo N. Benzicron ("Benzicron") is not dischargeable

under 11 U.S.C. §523(a)(2)(A).[1]  Dckt. No. 8, Amended Complaint. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I) and the Court has jurisdiction pursuant to 28 U.S.C. §1334.  For the reasons set forth below, the Court finds $82,000 of the debt is nondischargeable.

## FINDINGS OF FACT

This dispute involves vintage race cars.  Baker claims he was defrauded because the cars he bought from Benzicron were fabrications, not real refurbished 1960s vintage race cars.  Dckt. No. 108, Tr. 66:7-72:7.

Baker ran an auto repair business in the 1980s.  Id. at 29:15-16.  He also raced cars and won a national championship in a Corvette.  Id.  He says he retired from "real" racing in the 1990s but raced some stock car races and some vintage races in the 1990s. Id. at 29:12-30:9.  In semi-retirement, he began operating a website where he advertised, consigned, and sold cars.  Id. at 29:25-30:1-3.  Benzicron has been in the business of building, racing, and maintaining race cars for 40 years.  Id. at 132:4-9.

In July 2011, Mike Bohannon ("Bohannon") sent Baker at

---

[1] Unless otherwise noted all statutory references are to Title 11 of the U.S. Code.

2

least three emails containing photos of three 1960-era Lola T-70 race cars, along with various provenance/historical documentation and newspaper articles on these cars which were owned by Benzicron. Exs. 3-5.   The emails from Bohannon state:

> I have an exclusive on these three Lolas.  It is imperative that these do not wind up all over the Internet, as it would make the owner not a happy camper. I have seen these cars in person and they are finished to a high standard.  Lets [sic] try and deal with principals only.  Please contact me so we can discuss the above in greater detail.
>
> When you find a qualified buyer, please contact me and I will put together a package that will initially be photos only.

Ex. 3, p. 17.   While it is clear Benzicron gave Bohannon the "present-day" photos included in these exhibits, it is unclear who, if anyone, Bohannon represented in this transaction.  Dckt. No. 108, Tr. 172:2-23 and 174:4-14.  The emails also include some race and ownership history on each vehicle including:

- The '66 Lola was crashed in 1966.  Ex. 4, pp. 40-41. Benzicron purchased the remains and rebuilt and completed restoration of the vehicle in 2010 with it being tested in 2011.  Id.

- The '67 Lola was a roadster but now has a coupe body. Ex. 5, pp. 70 and 72.  Benzicron purchased and restored the car, with bigger brakes and a Hewland LG500 4 speed gearbox and transaxle.  Id. at 72. The literature states "[i]t is noteworthy that the original gearbox LG500-104 is still in existence."  Id.

3

- The '69 Lola was wrecked in 1988 and the chassis and suspensions were rebuilt at the factory and renumbered SL-137. Ex. 3, p. 34. The crashed chassis and some parts of the SL76/154 were rebuilt and ultimately sold to Benzicron. Id. at 31 and 34.

Ultimately, in August of 2011, Baker and Benzicron entered into a Sale & Purchase Agreement ("SPA") whereby Benzicron agreed to sell Baker the following three race cars:

    (1) 1966 Lola T70 MK II Spyder Chassis #SL71/33 complete race car ("'66 Lola");

    (2) 1967 Lola T70 MK III Coupe Chassis #SL73/108 complete race car ("'67 Lola"); and

    (3) 1969 Lola T70 MK IIIB GT Chassis #SL76/154 complete race car ("'69 Lola").

Ex. 6. The total consideration for the cars was $1,035,000 comprised of $800,000 in cash and a Lola T298 Chassis #HU95 race car valued at $235,000 to be delivered to Benzicron. Id. The SPA notes the cars were "sold as-is where-is" with Baker to take possession at Benzicron's California address. Id.

Before this 2011 transaction, Baker had never seen these type of Lolas before and according to the testimony at the §523 trial he purchased the cars based upon these emails without seeing/inspecting the cars or ever speaking to Benzicron. Dckt. No. 108, Tr. 35:1-9, 41:9-15, 44:3-12, 57:18-24, and 137:18-23.

4

Baker arranged for the loading, transport, and delivery of the cars from California to Massachusetts. Id. at 94:11-25. In transit, the '67 Lola became detached and was damaged. Id. at 95:1-13. Baker says the '67 Lola was not a fully assembled "complete car" and a bolt came lose in transit causing the damage. Id. Baker says he returned the '67 Lola to Benzicron for repair and completion. Id. at 95:23-96:8. Benzicron disputes this and testified that Baker asked him to repair the damage but did not mention the disassembled state at that time. Id. at 184:15-185:7. In fact, Benzicron stated he expected to be paid for repairing the car. Id. at 185:10-15. Sometime thereafter, the parties agreed Benzicron would keep the '67 Lola and give Baker a '59 Devin ("Devin"). Id. at 96:17-98:17 and 185:16-186:8.

Baker was to pick up the Devin at a racetrack in Wisconsin. Id. at 98:24-99:23 and 186:6-17. Benzicron says Baker knew he planned to race the Devin as evidenced by the pick-up location being the Wisconsin racetrack. Id. at 186:6-17. Baker denies this but says the fact that it was raced/damaged was immaterial. Id. at 99:3-6. Unfortunately, prior to Baker's collection of the car, the engine and gearbox were blown at the racetrack. Id. at 99:24-100:5. At the §523 trial, Baker testified he still took the Devin because

5

he thought "if I didn't get the Devin when I could, I'd probably never — I probably still would have zero.  So that is why we picked it up broken.  It's better to have a broken something than nothing." Id. at 100:7-10.

Baker says at the time he purchased the three Lolas he could not tell from the pictures whether they were original vintage 1960s cars, but now he knows more and can see that some of the components shown in these photos are not original or vintage.  Id. at 110:21-111:11.  For example, regarding the '66 Lola he now knows the brakes are not original and the motor would have iron heads, not the aluminum heads he received.  Id. at 38:8-45:17.  Baker acknowledges the pictures he received before the sale show that the '66 Lola was completely demolished and recreated.  Id. at 37:17-38:6.  The way it was destroyed led him to think no usable parts remain.  Id. at 38:20-23.  Baker also alleges the transaxle for both the '66 and '69 Lolas are fabrications and that the gearboxes are not Hewland gearboxes, but replicas made by Benzicron.  Id. at 70:3-71:12.

Baker also alleges the Devin was not really a Devin because the body was made out of aluminum, not fiberglass.  Id. at 85:23-86:12.  Baker now calls this car a "Kirkwood Special" because

6

Benzicron told him it was owned and rebuilt by John Kirkwood.  Id.
at 86:15-87:17.

The parties acknowledge that all of these cars are older
race cars where you would not expect all of the parts to be original;
however, Baker expected at least half of the parts to be original.
Id. at 39:2-7 and 181:18-183:21.

Benzicron acknowledges some parts on the three Lolas are
new but claims many of the parts are original parts he bought from
previous owners, such as casting for the uprights, the spindles, a
cast-iron engine block, shock assembly, springs, and original
bulkheads.  Dckt. No. 108, Tr. 142:10-144:8; Dckt. No. 110, Tr.
204:5-9;  215:18-216:21,  230:6-24,  and  236:21-237:3.  Benzicron
testified when the Lola factory sold a car, it would not be a
complete car, rather it would be a "rolling chassis."  Dckt. No.
110, Tr. 205:15-22 and 206:21-25.  He stated that when a professional
race car team got the rolling chassis, they would make modifications
to  meet  their  intended  use.   Id.  at  205:19-22  and  206:1-8.
Benzicron states there are not many, if any, original Lolas that
have not been retubed or repaired and if you could find one it would
be worth a couple of million dollars.  Dckt. No. 108, Tr. 143:6-8
and  183:19-23.   He  says  the  upgrades  he  made  to  these  Lolas

incorporated the original parts he bought from previous owners and were done where necessary for safety and other reasons. Dckt. No. 108, Tr. 181:18-183:21. He contends the cars are properly billed as cars from the 1960s. Dckt. No. 110, Tr. 223:23-224:9.

Baker also alleges the cars have fake chassis Vehicle Identification Numbers ("VINs"). He testified that every Lola chassis has a unique VIN. Dckt. No. 108, Tr. 62:4-10. Each Lola received by Baker had a VIN plate, but Baker says the plates are fabrications not originals. Id. at 45:18-24, 46:1-5, and 49:12-50:13. At the time Baker purchased the vehicles he did not know how to distinguish a real Lola VIN plate from a fabrication, but he now knows original Lola VIN plates are stamped into the metal causing them to be raised, contrary to the silk-screened VIN plates he actually received which are flat. Id. at 49:15-21. Baker states you can buy fake Lola VIN plates on eBay. Id. at 49:12-50:9. He also claims the Devin had a fabricated VIN plate. Id. at 86:13-23.

Benzicron denies fabricating any of the VINs. Id. at 135:6-7 and 159:5-7. He testified that he bought the "rights"[2] to

---

[2] Benzicron says when he talks about buying rights, he means that the original owner holds the rights to a race car that has been completely or substantially destroyed and then sells the rights to rebuild or restore that specific car along with whatever parts remain. Dckt. No. 108, Tr. 159:8-24.

the Lolas which included the VINs and the remaining original parts from the previous owner and then duly rebuilt the cars with the usable original parts.  Id. at 159:8-161:24.

Both parties acknowledge the '66 Lola was substantially destroyed in a 1960s wreck.  Id. at 38:23-39:6 and 161:8-24. Benzicron says that VIN plate was not intact, and he had to order a new one. Id. at 161:8-162:3.  He testified he paid John Starkey $1,500 to procure a legitimate Lola VIN plate for the '66 Lola.  Id. at 162:2-8; Dckt. No. 110, Tr. 199:22-201:18.  According to Benzicron, Starkey is a known Lola historian and author with ties to the Lola factory. Dckt. No. 108, Tr. 162:5-7; Dckt. No. 110, Tr. 199:25-200:12.  Benzicron contends the $1,500 payment to Starkey shows his intent to obtain a legitimate VIN plate rather than buying a fake $50 plate on eBay.  Dckt. No. 110, Tr. 235:25-236:20. Conversely, Baker says he now has the original paperwork for the '66 Lola and the original VIN plate is still in the toolbox of a mechanic who worked on this Lola in the 1960s, however Baker did not submit the original paperwork into evidence. Dckt. No. 108, Tr. 50:21-25.

As for the '69 Lola VIN plate, Baker contends it was rebuilt at a factory with a new number of 137. Id. at 66:18-21. Benzicron says the original chassis on the '69 Lola was damaged in

9

a crash and rebuilt at the Lola factory with number 137, leaving number 154 open.  Id. at 162:9-163:16.  Benzicron says the rights to this car and the number 154 chassis and parts were purchased and rebuilt by a third party and ultimately sold to him with VIN plate number 154.  Id.  Before he purchased the Lolas, Baker received background information on this '69 Lola, including the following:

SL76/154

1983: Built up by Lola Cars Ltd, as a post-production car. (one of the run of five cars built SL76/154-158 in the early 1980s)
.
.
.
.
Crashed in 1988.
Rebuilt at factory. Re-numbered as SL 76-137
.
.
.
.
SL76-137 Sold to [a third party]
1998: 6.8 litre engine fitted.

NOTE: The crashed chassis and some parts (upper and lower rear cross beams, uprights, some instruments) of SL 76/154 were sold to [third party], UK, who intended to rebuild SL76/154.
1989, sold the parts and chassis to [a third party] U.S. Chassis and suspensions were rebuilt by Robert Sothan of Northridge CA
1999: Sold the rebuil[t] chassis and parts to Lilo Benzicron of CA.

Ex. 3, p. 34.  These documents also include the bill of sale when

Benzicron bought the "Lola chassis and parts from chassis #SL-76-154.  Rebuil[t] chassis complete, using new and old orig[inal] panels/hardpoints (PU Points) bulkheads etc. suspension parts."  Id. at 31.

Baker testified he has attempted to sell the '66 Lola, the '69 Lola, and the Devin on his website for 10 years.  Dckt. No. 108, Tr. 72:16-18; Exs. 20-22.  He says prospective buyers lose interest when he accurately explains the cars' history.  Dckt. No. 108, Tr. at 71:22-72:2 and 72:20-23:1.  He has donated, or is in the process of donating, the '66 and the '69 Lolas.  Id. at 72:8-15 and 108:25. He received a tax contribution receipt for $195,000 for each of these donations.  Id. at 109:21-110:6. And, the '69 Lola ultimately was resold for $195,000 after Baker donated it.  Id. at 89:7-13. Baker is still trying to sell the Devin.  Ex. 22.

In May 2012, Baker and Benzicron entered into another Purchase and Sale Agreement ("PSPI") whereby Baker agreed to wire Benzicron $140,000 to purchase the "Lola Model #T163 Year 1968 Chassis #SL T 163/20 with all its spare parts if any" ("'68 Lola"). Ex. 8.  This was a resale arrangement and if the car resold for more than $185,000 Baker and Benzicron would split the profit, otherwise Baker would pay Benzicron an additional $20,000 for a total purchase

price of $160,000.  Ex. 8, p. 100.[3]  It is undisputed that Baker wired the $140,000 to Benzicron and never received the '68 Lola, his split, or a full refund of his money.  Dckt. No. 108, Tr. 79:2-6 and 148:4-11.  Benzicron claims Baker never received the car because they were in talks about who could sell the car for more money.  Id. at 148:6-11.  Benzicron stated, "I think we went back and forth on that car for a few months, and then he finally said, 'well, you know, go ahead, and sell the car.  Pay me back, or we trade, you know, one of the' — I don't remember.  But certainly, if he insisted, I would have shipped the car at that time."  Id. at 191:6-10. Ultimately, without Baker's knowledge, Benzicron sold the car to a third party for $120,000.  Id. at 80:4-81:4 and 158:7-13; Ex. 9. He did not remit any of this money to Baker until Baker demanded payment.

Once Baker discovered the sale, he demanded Benzicron refund his $140,000 or tender replacement vehicles.  Ex. 10. Benzicron replied he would "do all that is needed to make things right."  Id.  Benzicron acknowledges that he owed Baker $140,000

---

[3]  The PSPI tendered into evidence is unsigned, but the attached email from Benzicron provides that "this email is a signature confirmation for the attached agreement" and neither party disputes the existence of the agreement or its material terms.  Ex. 8.

12

but claims he has made repayments. Dckt. No. 108, Tr. 187:6-9. He claims he repaid $58,000 in cash and gave Baker a Lola model T240 S2000 Tiga ("Tiga) as well as a Swift model DB2 ("Swift") for this transaction. Id. at 158:7-17 and 187:6-191:3. This testimony about the Tiga and the Swift conflicts with other testimony where he claims the Tiga, Swift, and a gearbox were part of the repayment for the '67/Devin transaction. Id. at 152:13-154:9. Baker denies receiving any cash and his testimony at the §523 trial is consistent with the portion of Benzicron's testimony that credits the Tiga, Swift, and gearbox to the '67 Lola/Devin transaction, not this $140,000/'68 Lola transaction. Id. 103:4-106:2.

The final transaction involves a salvaged 2001 Viper ("Viper"). According to the §523 complaint, this was a resale arrangement where Benzicron was to use Baker's money to buy the Viper, resell it, and then remit the proceeds to Baker. Ex. 1, ¶2. According to the §523 complaint, Benzicron sold the car but never remitted the money to Baker. Id. at ¶3. At the §523 trial, Baker said he bought the Viper from Benzicron and resold it. Dckt. No. 108, Tr. 88:1-15.

Ultimately, the dispute about these vehicles arose and in 2015 Baker filed a lawsuit in Massachusetts against Benzicron

13

asserting many claims, including a breach of contract claim and a fraud claim. Ex. 1, Ex. A, Complaint and Jury Demand; Ex. 17. He alleged Benzicron "misrepresent[ed] to him that he was being sold original 1960's cars when he was being sold reproductions." Id. Prior to trial, without any admissions of liability, the parties entered into a settlement agreement with Benzicron agreeing to pay Baker approximately $1,000,000. Ex. 14. If Benzicron timely performed his settlement obligations, Baker agreed not to seek entry of judgment against him. Id. Benzicron failed to timely perform and a judgment was entered against him. Ex. 13.

Thereafter, Benzicron filed bankruptcy listing Baker's debt as an unsecured claim subject to discharge. Underlying Chapter 7 Case No. 18-11661, Dckt. No. 1, p. 8. In response, Baker filed this adversary proceeding contending this debt is not dischargeable. Ex. 1.

## CONCLUSIONS OF LAW[4]

Baker requests the Court deny the discharge of his debt pursuant to §523(a)(2)(A) which provides:

(a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an

---

[4] The subheadings used in this section are for organizational purposes only. The §523 analysis and conclusions in each subheading apply throughout.

individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud . . . .

11 U.S.C. §523(a)(2)(A). Objections to discharge are strictly construed against the objecting creditor and liberally in favor of the debtor. Harris v. Jayo (In re Harris), 3 F.4th 1339, 1345 (11th Cir. 2021). Baker has the burden of proof to establish each element by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991); Rentrak Corp. v. Cady (In re Cady), 195 B.R. 960, 964 (Bankr. S.D. Ga. 1996).

Pursuant to §523(a)(2)(A) a plaintiff must prove the traditional elements of common law fraud which are: (1) the debtor made a false representation with the intention of deceiving the creditor; (2) the creditor relied on the false representation; (3) this reliance was justified; and (4) the creditor sustained a loss as a result of the false representation. Stewart Title Guar. Co. v. Roberts-Dude (In re Roberts-Dude), 597 F. App'x 615, 617 (11th Cir. 2015).

The analysis in this case centers around four main transactions:

15

1. Baker's purchase of the '66, '67, and '69 Lolas;
2. The '67 Lola/Devin swap;
3. The $140,000/'68 Lola transaction; and
4. The Dodge Viper transaction.

### '66, '67, and '69 Lolas.

Baker argues the SPA required Benzicron to convey three restored original 1960s Lola complete race cars and contrary to those terms Benzicron delivered fabrications and an incomplete Lola. Baker contends Benzicron made false representations in the SPA and through his purported agent, Bohannon, with the intention of deceiving Baker, and that Baker justifiably relied upon these representations and suffered a loss. Benzicron denies these allegations.

#### Original vs. Fabrication.

Baker acknowledges it was not uncommon for these Lolas to be wrecked, but contends salvageable original parts remaining after wrecks and normal wear and tear are gathered and used to rebuild these vintage cars. It is undisputed that Baker did not expect to purchase 100% original Lolas, but he expected at least half of the parts to be original and he expected the VINs to be authentic. Dckt. No. 108, Tr. at 39:2-7 and 47:24-48:15. Instead, he says the Lolas are fabrications.

First, Baker contends the VINs for the '66 and '69 Lolas

16

are fabrications.  Specifically, Baker asserts the chassis VIN plate affixed to the '66 Lola was fabricated, not original.  <u>Id.</u> at 48:18-50:9.  He says the authentic plate for this car remains in a mechanic's toolbox.  <u>Id.</u> at 50:21-23.  At the time of the purchase, Baker says he did not know that original Lola VIN plates are stamped into the metal, so the numbers are raised, not smooth.  In addition, he says the '69 Lola VIN is incorrect, claiming it should be numbered 137, not 154.  Finally, Baker indicates he did not become aware of the fabrications until several years after he purchased the cars. <u>Id.</u> at 44:3-12, 45:9-17, 48:2-17, 58:12-18, and 66:7-13.

Conversely, Benzicron contends the VINs on the cars are authentic.  He testified he bought a legitimate Lola VIN plate for the '66 Lola from John Starkey for $1,500.  Dckt. No. 108, Tr. at 161:8-162:8.  He testified Starkey is a known Lola author and historian and Benzicron thinks he had ties to the Lola factory. Baker testified fake plates are available on eBay, and Benzicron acknowledges you can buy them on eBay for $50.  <u>Id.</u> at 50:1-7; Dckt. No. 110, Tr. 236:8-14.  Baker questioned whether the $1,500 fee Benzicron paid was actually a plate manufacturing fee.  Dckt. No. 110, Tr. 200:5-9 and 201:16-18.  Benzicron denies this and says the $1,500 payment shows his intent to provide a legitimate plate.  <u>Id.</u>

at 236:15-20.   The pre-sale documentation on the '66 Lola that Baker received from Bohannon reflects this car was badly damaged in a 1966 fatal wreck.   The usable parts were ultimately sold to Benzicron and the car "underwent a complete restoration which was completed [in] . . . 2010."  Ex. 4, p. 40.

Similarly, the '69 Lola pre-sale documentation included in the emails Baker received from Bohannon reflects the car was crashed in 1988 and was rebuilt and renumbered at the Lola factory as SL76-137.   Ex. 3, p. 34.   This SL76-137 is not one of the Benzicron cars.   This same pre-sale documentation provides additional information about the SL76-137 through 1998.   Id.   It also notes that "[t]he crashed chassis and some parts (upper and lower rear cross beams, uprights, some instruments) of SL76/154 were sold" and rebuilt by a third party and ultimately sold to Benzicron. Id.   The bill of sale shows Benzicron bought a Lola chassis and parts from Chassis #SL-76-154.   Id. at 31.   Benzicron claims this rebuilt car had VIN plate number 154 when he bought it.   Dckt. No. 108, Tr. 163:6-12.

Baker received these documents prior to the purchase and regardless of whether they accurately reflect the history of each vehicle, they do reflect that the VINs may have changed and the

18

parties' course of dealing.[5]  This is further highlighted by the fact that Baker was to give Benzicron a Lola T298 with chassis number HU95, but apparently delivered Benzicron a different vehicle with a different chassis number.  Id. at 106:3-107:19 and 180:13-181:5.  These documents also show that these cars had been wrecked, rebuilt and restored.

As for parts, Baker says at the time he purchased the three Lolas he could not tell from the pictures whether they were authentic 1960s cars, but now he knows more and can see that some of the key components shown in these photos are not original or vintage.  Id. 110:21-111:11.  For example, he now knows the brakes are not original and the motor would have iron heads, not the aluminum heads he received.  Id. 41:18-45:17.  Baker also alleges the transaxle for both the '66 and '69 Lolas are fabrications and that the gearboxes are not Hewland gearboxes but replicas.  Id. at 70:3-71:12.

Benzicron acknowledges some parts are new, but claims the cars also have original 1960-era pieces that he bought from the previous owners.  Id. at 142:10-144:8.  Benzicron testified he buys

_____

[5]  Baker attached these documents to his proof of claim and cannot now deny receiving them.  See Underlying Chapter 7 Case Number 18-11661, Proof of Claim No. 7.

the rights to rebuild these cars along with any salvageable parts. Id. 159:8-24.   He contends Baker knew the cars would have rebuilt and restored parts.   He says Lola sold a "rolling chassis" and parts were added by subcontractors and professional race teams.   He testified that the cars he sold Baker contained some authentic vintage parts, such as casting for the uprights, the spindles, a cast-iron engine block, shock assembly, springs, and original bulkheads.   Id. at 143:14-144:8; Dckt. No. 110, Tr. 204:5-9; 215:18-216:21, 230:6-24, and 236:21-237:3.   Furthermore, he contends the SPA does not state the Lolas are original, or what percent would be original; and it includes a disclaimer that the cars are "sold as-is where-is."[6]   Ex. 6.

At the §523 trial, Baker and Benzicron were the only witnesses.   The Court is unfamiliar with the restoration of vintage

---

[6] One of Benzicron's defenses is that the cars are "sold as-is where-is."   Ex. 6.   Baker counters, and the Court agrees, that the "as-is where-is" disclaimer in the SPA relates to condition, not identity and cannot overcome express warranties or fraud and so the language is not relevant to this §523(a)(2)(A) analysis.   See Bill Spreen Toyota, Inc. v. Jenquin, 294 S.E.2d 533, 536 (Ga. Ct. App. 1982)(stating sold "as is" means sold in its present condition); see Deer v. Booth (In re Booth), 2010 WL 5376214, at *2-3 (Bankr. M.D. Ala. Dec. 21, 2010)(implied warranties are not relevant to a fraud determination); Dare v. Jenkins (In re Jenkins), 607 B.R. 270, 286-88 (Bankr. N.D. Tex. 2019)(same); City Dodge, Inc. v. Gardner, 208 S.E.2d 794, 796 (Ga. 1974)("as-is" language cannot overcome any express warranties).

AO 72A
(Rev. 8/82)

off-road race cars.  No third-party provided information on what must be established for a car to be duly classified a rebuilt and restored Lola.  The process, if any, of obtaining replacement VIN plates for vintage race cars also remains unclear.  No third-party evidence was provided on the value of a restored Lola versus a fabrication.  Both parties acknowledge much of the testimony is Baker's word against Benzicron's.  The decision becomes one of assessing credibility and applying the burden of proof to each §523 element.  See Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 305 (11th Cir. 1994)(determining fraudulent intent depends mostly "upon an assessment of the credibility and demeanor of the debtor"); Harris v. Jayo (In re Harris), 3 F.4th 1339, 1345 (11th Cir. 2021)(stating objections to discharge are strictly construed against the objecting creditor and liberally in favor of the debtor).

Based upon the evidence submitted and considering the demeanor of the parties, the Court finds Baker has not carried his burden of proof to show Benzicron made a false representation with intent to deceive and upon which Baker justifiably relied and suffered a loss.  The SPA references the cars and chassis but does not include any restoration standard.  Ex. 6.  The pre-sale documentation provided to Baker shows that both the '66 and '69

21

Lolas were crashed, rebuilt, and restored. Exs. 3 and 4. The photos show the '66 Lola was completely totaled, rebuilt, and restored. Based upon these photos, Baker testified he did not think there were any usable parts after the crash. Dckt. No. 108, Tr. 38:20-23. Benzicron testified that he thinks he obtained a legitimate replacement VIN for the '66 Lola from Mr. Starkey. The pre-sale documentation for the '69 Lola shows both VINs 137 and 154 and notes that salvageable parts were used to rebuild number 154. Baker says these are false VINs and fabricated parts. Benzicron says they are legitimate VINs and properly restored vehicles. With this evidence, Baker cannot duly establish a false representation by Benzicron or justifiable reliance. Even though he did not have experience with this type of Lola, this is not justifiable reliance for an experienced mechanic and race car driver. Sears v. U.S. (In re Sears), 533 F. App'x 941, 945 (11th Cir. 2013)("Justifiable reliance is gauged by an *individual standard* of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case.").

Finally, as to the '67 Lola, it was damaged in transit and returned to Benzicron almost immediately, so Baker did not put

forth any evidence as to parts or VIN plate issues and therefore he has failed to carry his §523 burden to challenge the authenticity of the '67 Lola.

**Complete Car**.

Baker contends Benzicron tendered the '67 Lola only three-quarters assembled, and therefore failed to satisfy the "complete car" language of the SPA.  Ex. 6; Dckt. No. 108, Tr. 65:1-6 and 95:1-96:3.  It is undisputed that Baker arranged for the loading and transport of all the Lolas and that the '67 became dislodged and was damaged in transit.  Dckt. No. 108, Tr. 63:14-22 and 94:11-25.  Baker returned the '67 Lola to Benzicron for repair.  He contends he also returned the car because it failed to comply with the "complete car" provisions of the SPA.

Benzicron denies these allegations.  He testified Baker returned the car for repair and did not complain about its assembled state until much later.  Id. at 184:15-185:7.  Benzicron testified he anticipated being paid for this repair work.  Id. at 185:10-14.

The evidence is conflicting about the vehicle's assembled state.  After observing the demeanor of the parties and examining the evidence presented, the Court finds Baker has failed to carry his §523 burden of proof to establish a false representation made

23

by Benzicron with an intent to deceive Baker or justifiable reliance by Baker when Baker arranged for the collection/loading/transport of this car. Furthermore, considering this in isolation, or in the totality of the circumstances, Baker's claim on this item sounds in a breach of contract claim, not a fraud claim. See Bracciodieta v. Raccuglia (In re Raccuglia), 464 B.R. 477, 483 (Bankr. N.D. Ga. 2011)("[A] claim for relief sounding in breach of contract or negligence is not sufficient to supply the necessary factual basis to support a legal determination of nondischargeability."); see also 4 Collier on Bankruptcy ¶523.08(1)(d) (16th ed. 2021)("The failure to perform a mere promise is not sufficient to make a debt nondischargeable, even if there is no excuse for the subsequent breach.").

**Agency**.

Much of the testimony revolved around emails from Bohannon to Baker and whether Bohannon's representations can be imputed to Benzicron. Exs. 3-5. These emails include present-day photos along with bills of sale, descriptions, histories, older photos, and newspaper articles about the cars. Exs. 3-5. However, it is unclear who Bohannon was representing, if anyone. Benzicron acknowledges he provided Bohannon with the "present-day" photos of

24

the Lolas but denies providing him with the other information and denies Bohannon was acting as his agent. Dckt. No. 108, Tr. 172:2-12 and 174:4-20. Conversely, Baker argues Bohannon was Benzicron's agent and his representations can be imputed to Benzicron.

In §523 actions, actual fraud may be imputed to the debtor under agency principles. Hoffend v. Villa (In re Villa), 261 F.3d 1148, 1151-52 (11th Cir. 2001). Baker has the burden of proof to establish the existence of an agency relationship by a preponderance of the evidence. Loud v. Richie (In re Richie), 380 B.R. 868, 873 (Bankr. M.D. Fla. 2007)(establishing the plaintiff has the burden of proof as to each element of their cause of action by a preponderance of the evidence).

Under both California and Massachusetts law, an agency relationship may be expressed or implied.[7] See Cal. Civil Code §2298 (West 2022)("An agency is either actual or ostensible");

---

[7] A federal court must apply the choice of law rules of the forum state which is Georgia in this case. Erler v. Hasbro, Inc., 506 F.Supp.3d 1275, 1283 (N.D. Ga. 2020). Under Georgia's choice of law rules, the law of the state where the contract was made controls. Id. The contract is "made" where "the last act essential to the completion of contract was done." Id. There was no testimony or argument on this issue, but Benzicron was in California and Baker was in Massachusetts and the Court is considering the law of both states for purposes of agency analysis. Furthermore, given the facts and circumstances of this case, the conclusion is the same under Georgia law. See generally O.C.G.A. §10-6-1.

25

<u>Theos & Sons, Inc. v. Mack Trucks, Inc.</u>, 729 N.E.2d 1113, 1119 (Mass. 2000)("An agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control."). For an express agency, the agent must be employed by the principal. Cal. Civil Code §2299 (West 2022); <u>Chevalier v. Economou</u>, 1998 WL 201421, at *2 (Mass. App. Div. Apr. 15, 1998) ("Actual authority is express when the principal communicates to the agent, fully and explicitly, the acts he wishes the agent to perform and the extent of his authority to perform them.").

To establish an implied agency relationship Baker must show:

1.   a representation from Benzicron to Baker, which,
2.   caused Baker to reasonably believe that Bohannon was authorized to act for Benzicron, and which,
3.   induced Baker's detrimental, justifiable reliance upon the appearance of agency.

<u>Franza v. Royal Caribbean Cruises</u>, 772 F.3d 1225, 1251-52 (11th Cir. 2014); Cal. Civil Code §2300 (ostensible agency is "when the principal intentionally or by want of ordinary care causes a third person to believe another to be his agent who is not really employed by him"); <u>Chevalier</u>, 1998 WL 201421 at *2 ("[In Massachusetts],

26

'[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.' . . . It is essential to the creation of an agency by apparent authority that the principal communicate to a third person that another is his agent. There can be no apparent authority created by an undisclosed principal.").

An agency relationship also may be found by the principal's ratification of the unauthorized acts of an agent. JML Care Ctr., Inc. v. Bishop, 2004 WL 692164, at *3 (Mass. App. Div. Mar. 31, 2004); Dickinson v. Cosby, 250 Cal. Rptr. 3d 350, 366-67 (Cal. Ct. App. 2019). "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him." Dickinson, 250 Cal. Rptr. 3d at 366. "The general rule is . . . that a ratification of the unauthorized acts of an agent . . . must have been made with a full knowledge of all material facts, and that ignorance, mistake or misapprehension of any of the essential circumstances relating to the particular transaction alleged to have been ratified will

27

absolve the principal from all liability . . . ." Bishop, 2004 WL 692164 at *3.

In this case, insufficient evidence was presented to show any direct or indirect representation Benzicron made to cause Baker to reasonably believe Bohannon was Benzicron's agent, nor do we have evidence of an express agency or ratification. While the Bohannon emails state Bohannon has an exclusive to sell the Lolas, they also say Bohannon can put a package together when Baker finds a qualified buyer. Ex. 3. Baker operated a website where he sold, consigned, and advertised cars. Benzicron acknowledges he provided Bohannon the present-day photos of the vehicles but says he did not ask Bohannon to do anything. Dct. No. 108, Tr. 172:9-10. He denies Bohannon was his agent and denies knowing what Bohannon represented to Baker and denies paying Bohannon for this transaction. At the §523 trial there was insufficient evidence to establish the existence of an agency relationship. Furthermore, as discussed elsewhere, Baker's reliance on these exhibits to establish his claim is not justified.

**'67 Lola/Devin Swap.**

At some point after Baker returned the '67 Lola to Benzicron for repair, Baker decides he would rather have the Devin

28

Benzicron owned so the parties agreed they would swap the Devin for a credit on the '67 Lola. Dckt. No. 108, Tr. 96:9-22 and 186:2-8. The exact amount of credit was not agreed to, but the parties acknowledge the Devin was worth less than the Lola. Id. at 97:4-98:17 and 188:20-25. Baker valued the '67 Lola around $300,000-$311,000; and states a real Devin is worth $50,000-$200,000. Id. at 85:8-22 and 125:8-14. Benzicron states this Devin is worth about $150,000. Id. at 151:8-11.

Baker claims the Devin he received is a fabrication, not a real Devin. He claims it does not have any original parts and has a fake VIN plate. Id. at 86:13-23. He says a real Devin has a fiberglass body, not the aluminum body he received. Id. at 85:23-86:12. Baker now calls the car a Kirkwood Special because Benzicron told him it was previously owned and built by John Kirkwood. Id. at 86:15-87:9. He has listed it for sale as "Kirkwood Special," but he says is not even sure the car is a Kirkwood. Id. 86:19-87:9; Ex. 22.

In response, Benzicron testified the name Devin refers to a fiberglass manufacturer that would make/buy frames of other cars and put fiberglass bodies onto them, so what constitutes an original Devin vehicle is hard to say as there is no such thing. Dckt. No.

29

108, Tr. 149:16-150:8.  He says the car is named after the person doing the work so it may be named a "Devin Special" or a "Kirkwood Special" depending on who worked on the car.  Benzicron says he calls the car a Devin because that is its historical lineage. Benzicron states this particular car's nose was destroyed in a fire. It was rebuilt in aluminum by a man named John Kirkwood.  <u>Id.</u> at 150:10-21.  Benzicron claims he explained the history to Baker. <u>Id.</u>

To prevail on a §523(a)(2)(A) action, Baker must prove Benzicron made a false representation with intent to deceive Baker and that Baker justifiably relied upon the misrepresentation and suffered a loss.  11 U.S.C. §523(a)(2)(A); <u>Stewart Title Guar. Co. v. Roberts-Dude (In re Roberts-Dude)</u>, 597 F. App'x 615, 617 (11th Cir. 2015).  Based upon the evidence at trial, Baker has not established the first element necessary under §523(a)(2)(A) that Benzicron made a false representation with the intent to deceive Baker.  Baker expressed an interest swapping the Devin for the '67 Lola which cuts against a finding that Benzicron tried to defraud Baker with this swap.  It is unclear when Benzicron told Baker about the car's history, but it also weighs against a finding of an intent to deceive Baker.  For these reasons, as to the '67 Lola/Devin swap,

Baker has failed to establish any false representation Benzicron made with the intent to deceive Baker, nor has Baker established justifiable reliance or any resulting loss.

Furthermore, given the testimony presented, any remaining loss associated with the value differential between the '67 Lola and the Devin sounds in breach of contract, not fraud. For these reasons, Baker has failed to carry his burden of proof to establish a §523(a)(2)(A) claim as to the '67 Lola/Devin swap.

**$140,000/'68 Lola Transaction**.

In May 2012, Benzicron sent Baker the PSPI for Baker to purchase the '68 Lola from Benzicron for $140,000. Ex. 8. The PSPI states "[Benzicron] hereby will make available for delivery the race car . . . ." Ex. 8. The email from Benzicron accompanying the PSPI additionally clarifies that if the car is resold by Baker for more than $185,000, the profits would be split evenly; otherwise Baker would pay Benzicron an additional $20,000 for a total purchase price of $160,000. Id. at 100. The parties agree that Benzicron accepted Baker's $140,000 but never gave Baker the car or refunded all of his money. Dckt. No. 108, Tr. 76:9-79:6, 80:2-7; 148:4-14, 158:7-13. Instead, Benzicron sold the car to a third party for $120,000 without Baker's knowledge. Id. at 158:7-13.

31

Baker claims he received many assurances from Benzicron that he would receive the car, but he never did. Id. at 80:18-81:4. When Baker learned of the third-party sale/pawn, he confronted Benzicron in an email charging him with improperly selling the car or using it as collateral and demanding his $140,000 back or some cars of equal value. Ex. 10. In response, Benzicron replied via email that he "will do all that is needed to make things right." Id. At he §523 trial, Benzicron acknowledged that he owed Baker $140,000 for this transaction but claims he has made various repayments on this obligation.

After considering the evidence and observing the demeanor of the parties on this matter, the Court concludes the debt associated with this '68 Lola is nondischargeable under §523(a)(2)(A). In December of 2011, prior to the agreement being reached, Baker asked Benzicron if he should arrange for shipping the car. Ex. 7. Benzicron's email confirming his agreement to the PSPI also contemplates Baker selling the car. Ex. 8. This indicates both parties knew Baker was to get the car. Benzicron accepted Baker's $140,000 but never delivered the car, and, without Baker's knowledge or consent, he sold it for $20,000 less than Baker's purchase price. Dckt. No. 108, Tr. 80:4-17 and 158:7-13;

32

Ex. 9.  The Court finds this conduct shows Benzicron misrepresented his intent to perform his obligation.

This is more than a breach of contract; this is a false representation with the intent to deceive Baker because Benzicron never took steps to fulfill his obligation and he sold the car to someone else while retaining the proceeds.  See Demory v. Martin (In re Martin), 630 B.R. 766, 784 (Bankr. S.D. Miss. 2021)(ruling a debtor who signed a note with no intention to perform his obligation and never made any payments under the Note had made a false representation); 4 Collier on Bankruptcy ¶523.08(1)(d) (16th ed. 2021) ("a misrepresentation by a debtor of [their] intention to perform contractual duties . . . may be a false representation . . . if the debtor had no intentions of performing any of the obligations under the contract [and] this intent may be inferred . . .[if] the debtor failed to take any steps to perform.").

Baker's reliance on Benzicron's representations regarding the '68 Lola was justifiable.  "Justifiable reliance is gauged by an *individual standard* of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case."  Sears v. U.S. (In re Sears), 533 F. App'x 941, 945 (11th

AO 72A
(Rev. 8/82)

Cir. 2013) (emphasis in original)(citing <u>City Bank & Tr. Co. v. Vann</u> <u>(In re Vann)</u>, 67 F.3d 277, 283 (11th Cir. 1995)).  Benzicron represented that he would sell the '68 Lola to Baker and make it available for delivery.  He accepted Baker's $140,000 and failed to deliver the car or fully refund the money.  There is nothing to alert Baker that Benzicron would retain the car and sell it to a third party without his consent.  Even taking Benzicron's position, that Baker gave him permission to sell the car, there is nothing to alert Baker that Benzicron would retain all the proceeds.  In addition, after considering the evidence, the Court did not find Benzicron's position on this transaction to be credible.

Finally, Baker sustained a loss as a result of Benzicron's false representation.  The parties disagree on the amount of the loss.  Benzicron claims he repaid Baker $58,000 in cash and gave him the Tiga and Swift for this $140,000/'68 transaction.  Dckt. No. 108, Tr. 158:7-17 and 187:6-191:3.  At the §523 trial, Benzicron also testified that the Tiga, Swift, and a gearbox were given in repayment of the '67/Devin transaction.  <u>Id.</u> at 152:13-154:9. Baker denies receiving any cash and his testimony at the §523 trial is consistent with the portion of Benzicron's testimony that credits the Tiga and Swift to the '67 Lola/Devin transaction, not this

34

$140,000/'68 Lola transaction.  <u>Id.</u> at 103:4-106:2.

After considering the evidence and assessing the credibility of the witnesses, the Court finds Benzicron credible on the $58,000 cash repayment especially when coupled with Baker's Massachusetts complaint where he acknowledges receipt of some cash for this transaction.  <u>See</u> Ex. 18.  It is undisputed that Benzicron and Baker were involved in multiple transactions more than ten years ago.  Many of the terms of these transactions were casual and fluid and is not surprising that some of the transactions have become confused.  The Massachusetts complaint was tendered into evidence at the §523 trial, and while not taken for the truth of the matters asserted therein, it does lend support to Benzicron's cash repayment testimony.

For these reasons, after crediting Benzicron with the $58,000 cash payment, the Court finds Baker has established an $82,000 loss for the $140,000/'68 Lola transaction that is nondischargeable.

**2014 Viper Transaction**.

In his §523 complaint, Baker alleges he sent $20,000 to Benzicron for him to purchase and sell the Viper, with the sale proceeds to be remitted to Baker.  Ex. 1, ¶2.  The §523 complaint

35

alleges Benzicron took the money and purchased/sold the Viper but never remitted the $25,000 proceeds to Baker.  Ex. 1, ¶3.  However, at the §523 trial, Baker recalled he purchased a Viper from Benzicron and resold it.  Dckt. No. 108, Tr. 88:7-15.  With this testimony, the Court finds this portion of the debt is dischargeable.

## CONCLUSION

In conclusion, for the foregoing reasons, and given that objections to discharge are strictly construed against the objecting creditor and liberally in favor of the debtor, it is ORDERED that $82,000 of the debt owed by Benzicron to Baker is nondischargeable pursuant to §523(a)(2)(A); and the remaining portion of the debt owed by Benzicron to Baker is dischargeable.  It is further ORDERED that judgment is hereby entered in the amount of $82,000 against Benzicron and in favor of Baker.

AO 72A
(Rev. 8/82)